COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  | § |  |
|---|---|---|
| ERIC ANDREW ZIEGLER, | | No. 08-09-00188-CR |
| | § | |
| Appellant, | | Appeal from |
| | § | |
| v. | | 416th District Court |
| | § | |
| THE STATE OF TEXAS, | | of Collin County, Texas |
| | § | |
| Appellee. | | (TC # 416-81736-08) |
| | § | |

**O P I N I O N**

Eric Andrew Ziegler appeals his conviction of murder, enhanced by two prior felony convictions. A jury found Appellant guilty, found both enhancement paragraphs true, and assessed his punishment at life imprisonment. We affirm.

**FACTUAL SUMMARY**

On June 13, 2008, Appellant was residing with James Matisi at his home in Richardson, Texas. In an effort to assist Appellant, Matisi provided Appellant with a place to stay, food, clothing, and a cell phone. Matisi went to Sherman that evening to pick up his ten-year-old son, Jimmy, because it was Father's Day weekend. When they returned to the house, Matisi saw broken glass at the bottom of the stairs. He went upstairs to find Appellant and noticed blood in the master bedroom on the carpet, dresser, and walls. Matisi found Appellant in the master bath with a belt wrapped tightly around his arm like a tourniquet. Appellant had cut his pinky finger. Appellant was agitated and initially would not remove the belt even though his hand was swollen and the bleeding had stopped. Matisi helped Appellant bandage the wound and finally convinced him to remove the belt. Matisi yelled at Appellant for getting blood everywhere and told him to go to his bedroom.

After fixing dinner for Jimmy, Matisi cleaned up the blood while Jimmy played video games. Appellant came into the bathroom where Matisi was cleaning and apologized for making a mess but he was also upset that Matisi was more concerned about the mess than his injury.

Later that evening, Jimmy was hungry and Appellant volunteered to go pick up something for him. Appellant did not have his own vehicle so he borrowed Matisi's truck. Matisi fell asleep and did not wake up until after Appellant returned. He found Appellant in his bedroom with Ivonne Zamudio and Timothy "Chicago" Jones. Matisi was upset that Appellant had brought people to the house and he told Appellant privately that they needed to leave. They returned to the room and Matisi smoked crack with the group for a while. Matisi explained that he was afraid of Jones and hoped that if he went along with them they would leave. Jones asked Matisi for the belt which Appellant had used as a tourniquet because it was his belt. Matisi handed Jones the belt and he wrapped it around Zamudio's neck and began choking her with it for fifteen to twenty seconds. At trial, Matisi described the effort employed by Jones as somewhere between playful and forceful, but he told the police during an interview that Jones was "intense." When Zamudio said she did not think they were going to do that, Matisi interpreted Jones' actions as some kind of sexual play. Jones stopped when Appellant shook his head and waved his hand back and forth.

A short time after the choking incident, Appellant and Zamudio went into the bathroom. Matisi left the bedroom to check on Jimmy and found him still playing video games. He also went to his master bedroom to make sure Appellant had not taken his gun but it was still in the dresser where Matisi stored it. Matisi then found Appellant, Jones, and Zamudio in the bathroom. Appellant was standing behind Zamudio in the shower and Jones was standing outside of the shower. Both Appellant and Zamudio were fully clothed while Jones was in his boxer shorts. Matisi told Appellant that he had to get Jones and Zamudio out of the house and he left the bathroom. Matisi

told Jimmy to get ready for bed. When he walked by the bathroom, Matisi could see the light on in the guest bathroom and he heard water running. Matisi returned to his bedroom.

Sometime after Jimmy had fallen asleep in the master bedroom, Appellant came to the bedroom and asked Matisi for a condom. Matisi gave him one and Appellant left. Matisi could hear the water still running in the bathroom. A few minutes later, Matisi heard Zamudio state, "No, stop, don't do that." Fifteen minutes later, Appellant returned to the master bedroom naked and wet. He said, "I think I hurt the girl. I think I broke her leg. She's still breathing. How do I stop her from breathing?" Matisi did not believe Appellant and told him that it was his problem, to take care of it, and to get Jones and Zamudio out of the house. Appellant left the bedroom. Matisi did not call 911 because he was afraid of Jones. He instead barricaded the bedroom door and went to sleep.

Matisi woke up at 7 a.m., opened the bedroom door, and looked across at Appellant's bedroom. He saw Appellant staring at the wall and smiling. Because of Appellant's demeanor, Matisi became concerned that Appellant had actually killed Zamudio. Matisi returned to his bedroom, closed the door, and retrieved his gun. He was initially afraid to call 911 because he thought Appellant and Jones might hurt him and Jimmy if they found out he had called the police. Appellant came to the door to talk but Matisi would not open it and he told Appellant again to get Zamudio and Jones out of the house. Appellant left but then returned and began stacking against the door the items Matisi had purchased for him. Matisi next heard the garage door opening and he saw from the window that Appellant was getting in his truck. After telling Jimmy to call 911, Matisi left the bedroom and saw Jones alone in the guest bathroom. He continued downstairs and into the garage and saw Appellant backing out of the driveway. Matisi pointed his gun at Appellant and ordered him to drive back into the driveway. Appellant complied and went back into the house. Appellant went upstairs and into the master bath. Matisi ordered Appellant out of the bedroom and

then barricaded the door again. Both Jimmy and Matisi talked to the 911 dispatcher telling him that they thought a woman had been killed in the house about two hours earlier. Matisi told the dispatcher at one point that he believed Jones, rather than Appellant, had killed the woman. The police arrived a short time later and Matisi gave them consent to search his house.

Three Richardson police officers went to the residence in response to the 911 call. They opened the front door and heard an individual, later identified as Jones, standing at the top of the stairwell yelling at them to leave. Jones refused to come downstairs so the officers entered. Officer Ramon Nieto heard a door close near the top of the stairs. The officers proceeded upstairs and found Jones standing in the bathroom wearing only a belt. Two of the officers had to take Jones to the floor in order to handcuff him. Nieto next went into the master bedroom where he found Matisi and Jimmy hiding in the closet. The officers then found Appellant on the bed in a bedroom. Appellant appeared to be asleep and the officers had to wake him up.

Officer Mike Wieczorek spoke with Appellant outside of the residence. When Appellant saw Jones leaving the house with paramedics,[1] he told Wieczorek that he was afraid of Jones, did not know him, and did not know how he had gotten in the house. He also said he did not know anything about a female being inside of the house. Appellant also indicated surprise that the police were at the house and asked Wieczorek what was happening. After speaking with Appellant for a while and observing his mood swings and excitability, Wieczorek formed the opinion that Appellant was intoxicated. Appellant's behavior was consistent with drug use. Because Matisi would not allow Appellant back in the residence, Wieczorek placed Appellant under arrest for public intoxication and began transporting him to jail. During the drive, Appellant was agitated and kept moving around and stretching as though he was trying to get out of the handcuffs.

---

[1] Jones was taken to the hospital and treated for cuts on his leg.

After all of the civilians had been escorted out of the residence, Nieto went back inside and found several garbage bags in the bathroom where they had found Jones. One of the bags contained women's clothing. Nieto looked inside another bag and saw a human head without eyes. Body parts were found in three of the garbage bags. The remains were later identified as Ivonne Zamudio. The police also found a crack pipe in the guest bath, a shower rod across the sink and vanity in the guest bath, a camouflage knife in the sink in the master bath, and a baggie full of needles. Another officer went to the hospital with Jones and collected the belt worn by him.

Dr. William Rohr, the medical examiner, performed a modified autopsy on Zamudio's remains. He determined that her body had been disarticulated and mutilated post-mortem. Zamudio's tattoos had been removed and her genitals had been cut from the body. Dr. Rohr concluded that the victim's death had been caused by manual or ligature strangulation, or by other homicidal violence, which could include smothering or drowning.

The victim's tissue was found on the camouflage knife. Additionally, the DNA of Appellant, the victim, and one additional contributor was found on the knife. The belt worn by Jones at the time of his arrest contained the DNA of the victim, Appellant, and two other contributors. The victim's DNA was found under Jones' fingernails. Matisi did not have the DNA of any other person under his nails.

Detective Jules Farmer conducted multiple interviews of Appellant, Jones, and Matisi. In an interview conducted two days after Appellant's initial arrest, Appellant told the detectives that he had driven to Dallas on June 13 to get one of his girlfriends and obtain "party material" to smoke. Farmer understood "party materials" to mean drugs. Appellant went to some apartments and saw Jones and Zamudio, whom he described as a "crack whore." Appellant invited Zamudio and Jones to go back to Richardson with him. Appellant drove to another location where he obtained the drugs.

During a stop in Oak Lawn, Jones asked Zamudio for a sexual favor but she refused and instead asked Appellant for a hit of crack cocaine. Zamudio agreed to trade sex for crack cocaine, but she upset Appellant by reneging after smoking the crack. The trio returned to Richardson after stopping for something to eat. When they arrived at the house, they went into Appellant's bedroom and began getting high. Appellant and Zamudio then went into the bathroom and she traded sex for more crack cocaine. Afterwards, Zamudio returned to the bedroom and Appellant ran into Matisi in the hall. Matisi asked Appellant to get Jones and Zamudio out of his house and then accompanied Appellant into the bedroom. Jones became upset that Zamudio provided sexual favors to Appellant but had refused him. Appellant claimed to have calmed Jones by talking to him, but at some point during the evening, Jones grabbed a belt and put it around Zamudio's neck and began strangling her. Appellant stopped him and Zamudio indicated that she thought Jones was joking. Later, Appellant went into the bathroom where Jones and Zamudio were arguing and he saw Jones slapping Zamudio. Appellant wanted to give Zamudio a shower because she smelled bad so he took off her clothes. Appellant returned to his bedroom to get some shampoo and he asked Matisi for his knife. Appellant described his knife as having a stainless steel blade and a camouflage handle. Appellant put the knife in his pocket and returned to the bathroom where he found Zamudio and Jones in the shower. Appellant left the bathroom again to talk to Matisi. As they were talking, he heard banging coming from the bathroom. When he returned to the bathroom, he found Jones choking Zamudio in the tub which was full of water. Appellant told him to stop, but Jones said that it was too late. At Jones' request, Appellant retrieved some trashbags from downstairs. After Jones told him that he needed two hours, Appellant emptied his pockets on the counter and left the bathroom. At another point in the interview, Appellant said he gave the knife to Jones.

Detective Farmer testified that he asked Appellant whether the tub had water in it the first

time he went in and saw Jones holding down Zamudio. Appellant replied, "When I came in there and I started choking her again, the tub wasn't full of anything." Farmer repeated essentially the same question, and Appellant again said, "When I went in there and started choking her again and choking her again," but he stopped and changed the subject to explain how Jones got the knife. Farmer did not press Appellant on these inculpatory statements because he did not want him to terminate the interview. After the next break, Farmer became more forceful with the questioning and Appellant terminated the interview.

A grand jury indicted Appellant for the murder of Zamudio. The jury found Appellant guilty as a principal actor or as a party. At the punishment phase, Appellant pled true to both enhancement paragraphs. The State also introduced evidence establishing Appellant had several other misdemeanor and felony convictions. This appeal follows.

## ADMISSION OF VIDEOTAPED STATEMENT

In Issue One, Appellant argues the trial court abused its discretion by admitting the entire videotaped statement after he invoked his right to counsel. The State responds that Appellant requested counsel only for a narrow purpose and not as a pre-condition to speaking with the police.

### Standard of Review

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador v. State*, 221 S.W .3d 666, 673 (Tex.Crim.App. 2007). We give almost total deference to a trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor, but we review *de novo* application-of-law-to-fact questions that do not turn on credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex.Crim.App. 2005).

When the trial court has not made a finding on a relevant fact, we view the evidence in the

light most favorable to the trial court's ruling and assume the trial court made implicit findings of fact supported by the record. *Herrera v. State*, 241 S.W.3d 520, 527 (Tex.Crim.App. 2007). We will uphold the trial court's ruling if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *State v. Dixon*, 206 S.W.3d 587, 590 (Tex.Crim.App. 2006).

*Underlying Facts*

The police interviewed Appellant on three occasions. They interviewed him following his arrest, but Appellant invoked his right to counsel and the police terminated the interview. Two days later, Appellant reinitiated contact with the police and the police interviewed him for several hours. This is the videotaped interview admitted into evidence over Appellant's objection. When the police attempted to interview Appellant the following day, Appellant terminated the interview. Appellant filed a motion to suppress a large portion of the second interview, claiming that the police failed to terminate the interview after he invoked his right to counsel.

Approximately two hours into the second interview, the detectives decided to present Appellant with a photo array containing the photo of Zamudio, because they wanted to be sure Appellant was talking about the victim. Before showing Appellant the array, however, the detectives presented him with written instructions shown to any witness viewing a photo array for the purpose of identifying a suspect. One of the detectives explained to Appellant that they had only one kind of form which pertained to identification of the "bad guy" but they were only trying to make sure they were all talking about the same girl. Appellant read the instructions[2] and asked about the portion which stated "just because a police officer was showing you a group of photographs, that this should not influence your judgment in any way." Appellant asked, "your judgment for --?" The

---

[2] The written instructions were not admitted into evidence during the suppression hearing, but the trial court summarized them as stating "the picture may not be in there, if don't -- you don't recognize anybody, that's fine." Appellant's counsel agreed that the admonitions contained these types of statements.

detective explained again that the form is typically used to identify a "bad guy" and the instruction was intended to tell the witness that just because the officer showed the witness a group of pictures it did not mean that the bad guy was necessarily in the lineup. He added that they were using the lineup to make sure Appellant and the detectives were talking about the same girl since Appellant did not know her name. The following exchange then occurred:

> [Appellant]: Could I have maybe an--an attorney maybe break this down in a real manner to have it with me. Would that be okay? I'm kind of--

> [Detectives talking over each other]: That's fine. We don't have to--

> [1st Detective]: We can do that later.

> [2nd Detective]: We can do that later.

> [Appellant]: Well, I mean, I've got no problem--

> [1st Detective]: Basically what that says is that the person may not be in there; they may be in there. You're under no obligation to pick somebody. We're just trying--

> [Appellant]: You're--you're going to show me photos and ask me--

> [1st Detective]: We're going to say is the person that was with you one of these six?

> [Appellant]: Oh, okay.

Appellant then viewed the array and identified the photo of Zamudio as the woman he had been speaking about, and the interview continued. The trial court denied the motion to suppress finding that it was not a clear, unequivocal request for an attorney.

*Limited Request for Counsel*

Under the Fifth Amendment, an accused has a right to have counsel present during custodial interrogation. *Edwards v. Arizona*, 451 U.S. 477, 481-82, 101 S.Ct. 1880, 1883, 68 L.Ed.2d 378 (1981). Once a suspect has invoked his Fifth Amendment right to counsel, police interrogation must cease until counsel has been provided or the suspect himself initiates further communication with

the police.  *State v. Gobert*, 275 S.W.3d 888, 892 (Tex.Crim.App. 2009), *citing Edwards*, 451 U.S. at 484-85, 101 S.Ct. at 1885.

Not every mention of a lawyer is sufficient to invoke the Fifth Amendment right to the presence of counsel during questioning.  *Gobert*, 275 S.W.3d at 892.  Officers are not required to seek clarification or halt questioning if the suspect makes an ambiguous or equivocal statement with respect to counsel.  *Id.*  Whether the mention of a lawyer constitutes a clear invocation of the right to counsel will depend upon the statement itself and the totality of the surrounding circumstances.  *Id.*  The court must determine whether the suspect articulated his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.  *Id.* at 892-93.  The reviewing court examines the totality of circumstances to determine whether any statement referencing counsel was really a clear invocation of the Fifth Amendment right.  *Id.* at 893.  Finally, when a suspect makes a clear, but limited, invocation of the right to counsel, the police must honor the limits that are thereby placed upon the interrogation, but they may question their suspect outside the presence of counsel to the extent that his clearly expressed limitations permit.  *Id.* at 893, *citing Connecticut v. Barrett*, 479 U.S. 523, 529, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987).

In *Connecticut v. Barrett*, the police gave the defendant his *Miranda* warnings prior to interviewing him about his involvement in a sexual assault.  *Connecticut v. Barrett*, 479 U.S. at 525, 107 S.Ct. at 830.  The defendant stated that "he would not give the police any written statements but he had no problem in talking about the incident."  *Id.*  The defendant spoke with the officers and admitted his involvement in the sexual assault.  *Id.*  When the officers discovered that the tape recorder used during the interview had malfunctioned, the police spoke with the defendant a second time.  *Id.*, 479 U.S. at 525-26, 107 S.Ct. at 830.  After being given his *Miranda* warnings again, the

defendant reiterated that "he was willing to talk about [the incident] verbally but he did not want to put anything in writing until his attorney came." *Id.*, 479 U.S. at 526, 107 S.Ct. at 830. He then repeated his confession. *Id.* When the officers discovered that their tape recorder had again failed to record the statement, one of the officers reduced to writing his recollection of the defendant's oral statements. *Id.* The trial court found the oral statements admissible, but the Connecticut Supreme Court reversed, finding that the defendant's statement served as an invocation of the right to counsel for all purposes. *Id.*, 479 U.S. at 526-27, 107 S.Ct. at 830-31. The United States Supreme Court reversed because it found that the defendant's limited requests for counsel were accompanied by affirmative announcements of his willingness to speak with the authorities and the officers did not violate the limited invocation of his right to counsel. *Id.*, 479 U.S. at 529, 107 S.Ct. at 832.

It is undisputed that Appellant terminated the first interview but he reinitiated communications with the police two days later and waived the right to counsel at the beginning of the second interview. He did not make any request for counsel until the detectives presented him with the instructions related to a photo lineup. Appellant asserts that his request for counsel to "break it down for him" was an unequivocal request for counsel for all purposes and the interrogation should have immediately ceased. We disagree because it takes Appellant's request for counsel out of context. The video reflects that Appellant made the request for the limited purpose of explaining the written instructions. When the detectives stated they would show him the photo array another time and one of the detectives reached toward Appellant to retrieve the instructions from his hand, Appellant stated he had "no problem" while pointing to the instructions. One of the detectives then clarified the process and Appellant indicated he understood while nodding his head up and down vigorously. At the same time, Appellant returned the instructions to one detective and indicated with a somewhat exaggerated motioning of his hand for the detective holding the photo

array to give it to him. Appellant viewed the photo array and identified Zamudio's photograph. The interview then continued. Appellant's request for counsel to explain the instructions was not ambiguous. Therefore, we will not give it the broad interpretation Appellant seeks because doing so would require us to disregard the ordinary meaning of the request. *See Barrett*, 479 U.S. at 529-30, 107 S.Ct. at 832. We conclude that Appellant's limited request for counsel to explain the photo array instructions did not require the detectives to cease the interrogation immediately nor did the request render inadmissible the remainder of the interrogation captured on video.[3] *See Barrett*, 479 U.S. at 529, 107 S.Ct. at 832. Issue One is overruled.

## LEGAL SUFFICIENCY

In Issue Two, Appellant challenges the factual sufficiency of the evidence supporting his conviction. After the parties filed their briefs, the Court of Criminal Appeals held in *Brooks v. State* that the *Jackson v. Virginia* legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893 (Tex.Crim.App. 2010). Rather than refusing to review Appellant's issue at all in light of *Brooks*, we will review the legal sufficiency of the evidence.

### Standard of Review

In reviewing the legal sufficiency of the evidence to support a conviction, an appellate court must consider all of the record evidence in the light most favorable to the verdict, and must determine whether, based on that evidence and reasonable inferences therefrom, any rational trier of fact could have found the defendant guilty of all the elements of the offense beyond a reasonable

---

[3] Appellant does not contend on appeal that the portion of the videotape pertaining to his request for counsel and his identification of the victim in the photo array should have been suppressed. Accordingly, we have not addressed that issue.

doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex.Crim.App. 2009). This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789; *Klein v. State*, 273 S.W.3d 297, 302 (Tex.Crim.App. 2008). We consider all of the evidence, whether admissible or inadmissible. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex.Crim.App. 2007); *Wilson v. State*, 7 S.W.3d 136, 141 (Tex.Crim.App. 1999). When the record supports conflicting inferences, we presume that the fact finder resolved the conflicts in favor of the prosecution and therefore defer to that determination. *Clayton*, 235 S.W.3d at 778. The same standard of review is used for both direct evidence and circumstantial evidence cases. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex.Crim.App. 2007).

*Elements of the Offense*

The indictment alleged that Appellant intentionally and knowingly caused the death of Zamudio by strangling her with an object, a deadly weapon, the exact nature of which is unknown to the grand jury, and by manner and means unknown to the grand jurors. *See* TEX.PENAL CODE ANN. § 19.02(b)(1)(West 2003). The application paragraph of the court's charge permitted the jury to convict Appellant as a principal, or as a party if the jury found that he solicited, encouraged, directed, aided, or attempted to aid Jones in committing the murder of Zamudio. *See* TEX.PENAL CODE ANN. §§ 7.01, 7.02 (West 2003). The jury returned a general guilty verdict.

*Review of the Evidence*

We begin by examining the sufficiency of the evidence supporting Appellant's guilt as a principal. Matisi testified that when he went to bed, Zamudio was with Appellant and Jones in the bathroom. Some time later, Appellant went into Matisi's bedroom and asked for a condom. After

a few minutes, Matisi heard Zamudio state, "No, stop, don't do that." Fifteen minutes later, Appellant returned to the master bedroom naked and wet. He told Matisi he had hurt Zamudio and he wanted to know how to stop her from breathing.

The DNA evidence also connected Appellant to the murder and his attempt to dispose of the body. The knife, which Appellant admitted retrieving from Matisi that evening, had on it the tissue and DNA of the victim as well as the DNA of Appellant and one additional contributor. The belt worn by Jones at the time of his arrest bore the DNA of the victim, Appellant, and two other contributors. Appellant argues that the presence of his DNA on the belt is explainable because he had used the belt as a tourniquet when he cut his finger. He claims that the presence of his DNA on the knife should be expected since he regularly carried the knife with him. It was the jury's task to resolve the conflicts in the evidence and decide what weight to assign the DNA evidence.

Appellant made incriminating statements in his second interview. The audio on the DVD is difficult to hear, but Appellant can be heard on the video stating that Jones choked Zamudio but Appellant can also be heard stating, "When I went in there and started choking her again and choking her again...." Appellant attacks the quality of the video recording and urges that it should not be considered. Even if we could exclude the video evidence from our sufficiency review, Detective Farmer recounted how Appellant told them during his second interview that he had choked Zamudio. Detective Steven Baxter was listening to the interview from outside of the room and he heard Appellant clearly state he had "strangled" the victim or words to that effect.

The evidence also showed that Appellant had a consciousness of guilt. After the police arrived and secured the scene, Appellant lied to the police when he said he did not know Jones or how he got into the house, and he did not know anything about a woman being in the house. A defendant's conduct in lying to police officers shows a consciousness of guilt, and may be considered

as circumstantial evidence of guilt. *King v. State*, 29 S.W.3d 556, 565 (Tex.Crim.App. 2000) (making false statements to cover up crime is evidence indicating a consciousness of guilt and is admissible to prove commission of offense); *Torres v. State*, 794 S.W.2d 596, 598 (Tex.App.--Austin 1990, no pet.)(defendant's conduct after crime indicating consciousness of guilt is "one of the strongest kinds of evidence of guilt").

After considering all of the evidence in the light most favorable to the verdict, we find that the evidence is legally sufficient to prove beyond a reasonable doubt that Appellant caused Zamudio's death as alleged in the indictment. It is therefore unnecessary to review the legal sufficiency of the evidence supporting Appellant's guilt as a party. Issue Two is overruled.

## ADMISSION OF GRUESOME PHOTOGRAPHS

In Issue Three, Appellant contends the trial court abused its discretion by admitting five crime scene photographs and four autopsy photographs because the danger of unfair prejudice substantially outweighed the probative value. The State responds that the trial court correctly balanced the relevant factors under Rule 403.

Rule 403 of the Texas Rules of Evidence provides that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence. TEX.R.EVID. 403. A court may consider many factors in determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice, including: the number of exhibits offered, their gruesomeness, their detail, their size, whether they are in color or black-and-white, whether they are close up, whether the body depicted is clothed or naked, the availability of other means of proof, and other circumstances unique to the individual case. *Davis v. State*, 313 S.W.3d 317, 331 (Tex.Crim.App. 2010); *Williams v. State*, 301 S.W.3d

675, 690 (Tex.Crim.App. 2009). The admissibility of photographs over an objection is within the sound discretion of the trial court. *Davis*, 313 S.W.3d at 331. Autopsy photographs are generally admissible unless they depict mutilation of the victim caused by the autopsy itself. *Id.*

State's Exhibits 9, 10, 15, 16, and 17 are photographs taken at the crime scene. State's Exhibit 9 is a photograph of garbage bags on the bathroom floor taken from a distance of several feet. The head and internal organs are partially visible. State's Exhibit 10 is a closer view of the same garbage bags and body parts State's Exhibit 15 is a close-up view of the head from a different angle and depicting a portion of the scalp which has been cut away. State's Exhibit 16 is a close-up view of the head depicting the empty eye sockets. State's Exhibit 17 is a closer view of the bags containing the limbs and torso. State's Exhibits 19 through 22 are autopsy photographs. State's Exhibit 19 is a photograph of the body parts removed from "Bag 1" on the autopsy table. It shows the scalped head, eyeball, hair, and tissue fragments. State's Exhibit 20 is a redacted photo of the torso and State's Exhibit 21 is a redacted photo of limbs. Appellant waived any complaint he had with respect to State's Exhibits 20 and 21 because he stated that he had no objection to these two exhibits after the State redacted the photos to show only antemortem injuries. TEX.R.APP.P. 33.1. The trial court sustained Appellant's objection to State's Exhibit 22 and did not admit it into evidence. Consequently, our review is limited to the remaining five crime scene photographs (State's Exhibits 9, 10, 15, 16, and 17) and one autopsy photograph (State's Exhibit 19).

The record reflects that the trial court was extremely cautious in conducting the Rule 403 balancing test with respect to the photographic evidence. The court excluded some photographs and required the State to redact others. The photographs being reviewed on appeal are 8 1/2 by 11 inches in size. The trial court did not allow the State to display the exhibits on a larger screen in the courtroom unless it was necessary to explain how items were found at the crime scene or for the

medical examiner to explain the victim's injuries. The court also required both the State and defense to remove the enlarged image from the jury's view immediately after it was longer necessary for the witness's testimony. It is unclear whether the original exhibits are color photographs but the copies of the exhibits in the appellate record are black and white.

The photos are undeniably gruesome but that fact alone does not render the probative value of the exhibits outweighed by any unfair prejudice. *See Narvaiz v. State*, 840 S.W.2d 415, 430 (Tex.Crim.App. 1992). The exhibits merely depict the crime scene and the condition of the victim's body due to Appellant's actions. *See Williams*, 301 S.W.3d at 693 (noting that close-up photos of injuries were gruesome but they portrayed no more than the gruesomeness of the injuries inflicted by the defendant); *Narvaiz*, 840 S.W.2d at 430 (the photographs, although gruesome, merely depict the gruesomeness of the crime scene as found by the police). The photographs have additional probative value in that they depict the efforts undertaken by Appellant to hide the crime, dispose of the body, and prevent identification of the victim by removal of her tattoos. It was not outside the zone of reasonable disagreement for the trial court to conclude that the danger of unfair prejudice did not substantially outweigh the probative value of the photographs. Accordingly, we find that the trial court did not abuse its discretion by admitting State's Exhibits 9, 10, 15, 16, 17, and 19. We overrule Issue Three and affirm the judgment of the trial court.


March 9, 2011

_____
ANN CRAWFORD McCLURE, Justice

Before Chew, C.J., McClure, and Rivera, JJ.

(Do Not Publish)